OPINION
Defendant-appellant, Sean M. Steele, appeals the April 11, 2000 judgment entry of the Franklin County Court of Common Pleas convicting appellant of two counts of murder in violation of R.C. 2903.01 and sentencing appellant to two consecutive fifteen to life terms of imprisonment. In so doing, appellant challenges the December 17, 1999 decision of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, to relinquish jurisdiction over the matter and to transfer appellant (i.e., to bind appellant over) to the General Division of the Franklin County Court of Common Pleas for criminal prosecution as an adult. Appellant also raises several alleged errors by the trial court during his criminal trial and in the imposition of consecutive sentences. For the following reasons, we affirm the juvenile court's bindover decision and appellant's conviction on two counts of murder, but reverse and remand for resentencing.
In September 1999, appellant was charged in juvenile court on two counts of aggravated murder. Both charges arose out of the allegation that, on August 26, 1999, appellant, age fifteen at the time, lured his girlfriend Barbara Watkins to a wooded area near the Easton Town Center in Columbus, Ohio, and killed her and her unborn child. Pursuant to R.C. 2151.26(C), the state requested that the matter be transferred to the general division of the court of common pleas for criminal prosecution as an adult. On November 9, 1999, the juvenile court held a probable cause hearing and, thereafter, found that there was probable cause to believe that appellant committed the two acts of aggravated murder as alleged in the complaint.
On December 7, 1999, the juvenile court held an amenability hearing at which the court heard testimony from several defense witnesses and reviewed the bindover packet containing a psychological evaluation, social history, and detention records of appellant. On December 17, 1999, the juvenile court rendered its decision to relinquish jurisdiction and transfer appellant for criminal prosecution as an adult.
In its decision, the juvenile court made the following findings concerning appellant's background and personal characteristics:
(1) Appellant is of high average intelligence and does not suffer from any major mental, physical, or psychological disorder. He was found to be relatively mature and sophisticated, capable of planning ahead and considering the consequences of his actions.
(2) Appellant had a poor initial family life with a history of drug and alcohol abuse on the part of his mother and criminal behavior on the part of his father. Appellant was eventually separated from his parents and his siblings through intervention of Franklin County Children Services.[1]
(3) Appellant had very caring and supportive custodial parents. He was disciplined well and nurtured well under their care. He is described as polite, quiet, mannerly, respectful to friends and friends' mothers. In reports to his parents and to others, he has shown the capability for remorse.
(4) Appellant received mostly C's, some A's, B's, and D's at school, had passed all but two of his proficiency exams, and had been a member of R.O.T.C. School records further indicated that he was tardy five to six times, received detention, and failed to show up.
(5) Appellant had no prior contacts with the juvenile court system, and no substance abuse problem was found; however, he admitted to having stolen money from his employer, was reported to be spending more money than he made, and was in possession of two cell phones and two pagers. Detention records showed that he had failed to follow rules, participate in activities, and had been a disruption in the classroom.
The juvenile court then made the following observation:
 If Sean were to remain in the juvenile system, five years remain in which to rehabilitate him. And if the Court were to stop here, there would be no question that this Court would keep Sean in the juvenile system. However, this is not the end of this Court's inquiry. Case law in Ohio provides that the Court may consider the seriousness of the crime when determining whether or not to bindover a juvenile. Although Sean does not have a prior record, and this is his first delinquency charge before the court, the Court cannot overlook the seriousness of the alleged crime. The evidence that these were planned acts, that he lured his victim to a killing field, committed the acts without provocation, and concealed his acts until confronted.
 The Court finds that if Sean is found to have committed these alleged crimes, the seriousness of these crimes may require him to be retained past the age of majority. Moreover, the Court must consider that had these acts taken place a month later, the Court would not be having this discussion. The Court would have lost all jurisdiction, and the case would have automatically been transferred to the General Division.
Finally, in support of its decision to bind appellant over for adult prosecution, the juvenile court noted that two of the five factors specifically delineated in R.C. 2151.26(C)(2) supporting an order transferring the case were implicated. First, one of the victims (i.e., the fetus) was five years of age or younger. See R.C. 2151.26(C)(2)(a). Second, both victims sustained physical harm (i.e., death) as a result of the acts charged. See R.C. 2151.26(C)(2)(b).
On March 28, 2000, a jury trial was commenced in the general division of the court of common pleas. At trial, the state presented evidence that, on September 22, 1999, the badly decomposed body of Barbara Watkins, age fifteen, and her unborn fetus were discovered in a wooded area near the Easton Town Center. Barbara Watkins had been reported missing since August 26, 1999.
The state further presented evidence that appellant and Barbara Watkins first met earlier in the spring at Wyandot Lake, where they both worked, and the two became involved with each other. At some point, Barbara Watkins discovered that she was pregnant and told appellant, friends, and relatives that appellant was the father. Some of these friends and relatives testified that appellant wanted Barbara to have an abortion but that she refused. At some point, appellant gave Barbara $200 for an abortion, but she spent the money instead on clothing and shoes. One friend testified that two or three weeks before Barbara's disappearance, he overheard appellant threaten to kill Barbara and her baby.
On the day Barbara Watkins' body was discovered, Columbus Police Detective Pat Barr interviewed appellant at his home. During this conversation, appellant denied any involvement in Barbara's death, claimed to have last seen her in late July, and denied the unborn child was his. The next day, however, appellant confessed to his cousin, Adrienne Green, that he was involved in the death of Barbara. In particular, appellant told his cousin that he lured Barbara into the wooded area by telling her that he had money buried under a knife there, that he hit her in the neck with a broken bottle, that she turned to run away and he grabbed her and choked her, and that he eventually hit her in the head with a rock.
At the suggestion of his cousin, appellant met with Pastor Wilbert Butler the following day, and again recounted his story to him. Pastor Butler then convinced appellant to turn himself in. Later that day, September 24, 1999, appellant, with his uncle and Pastor Butler present, confessed to Detective Barr about his involvement in Barbara Watkins' disappearance and death. Detective Barr described appellant's statement as follows:
 A. He [appellant] stated that the two of them [appellant and Barbara Watkins] had met down at City Center for the purpose of purchasing baby clothes for the unborn child. He stated that they got on a bus near the Statehouse and took the bus to Easton mall, that there was some argument on the bus between the two of them concerning the baby, or the upcoming birth of the baby. He stated that when they got off the bus, they argued some more and that I believe he told me that Barbara walked towards the ravine where she subsequently was found and that he followed her in there. He stated that he lost it and that he strangled her or that he choked her. We had a hard time getting him to go into any detail. I believe I asked him if she was still moving after he choked her, and I think he stated that she was. I asked him if he knew if she was dead, and his response was incoherent. I think we went over it a couple of times, and then Mr. Tucker asked a few questions, and then near the end of the interview, the pastor brought up the fact that Sean hadn't told me everything. I believe he said, tell him about the rock. We asked him about that. He stated that after he had choked Barbara Watkins, that he picked up a rock and dropped it on her head. Near her body there was a socket down in the mud where a rock approximately that big (indicating) had been taken out, it was laying out of the socket up near her head, and I asked him, was it that rock?
Q. Did you do that with your hands?
 A. Like that (indicating). And he went, he acknowledged it. He said, did you hit her anywhere else with it? He said no. How many times did you hit her with it? I believe he said once. [Tr. 308-309.]
Finally, the state presented forensic evidence concerning the condition of Barbara's body and that of the fetus, which was estimated to be approximately twenty-six to thirty-six weeks gestation. Appellant presented no witnesses in his defense.
On March 31, 2000, the jury found appellant not guilty of aggravated murder as to both of the victims but found appellant guilty of the lesser included offense of murder as to each victim. By judgment entry filed April 11, 2000, the trial court sentenced appellant to fifteen years to life on each murder conviction, with the sentences to run consecutively. It is from this judgment entry that appellant appeals, raising the following seven assignments of error:
ASSIGNMENT OF ERROR NO. 1:
 THE JUVENILE COURT ERRED AND ABUSED ITS DISCRETION IN TRANSFERRING SEAN M. STEELE TO THE FRANKLIN COUNTY COURT OF COMMON PLEAS TO BE TRIED AS AN ADULT.
ASSIGNMENT OF ERROR NO. 2:
 THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO APPOINT TWO ATTORNEYS TO REPRESENT DEFENDANT-APPELLANT IN AN AGGRAVATED MURDER CASE, SUCH FAILURE HAVING RESULTED IN DENIAL OF EFFECTIVE ASSISTANCE OF COUNSEL GUARANTEED BY THE SIXTH AMENDMENT TO THE CONSTITUTION OF THE UNITED STATES AND ARTICLE I, SECTION 10 OF THE OHIO CONSTITUTION, AS WELL AS VIOLATING THE DUE PROCESS CLAUSE AND EQUAL PROTECTION CLAUSE OF BOTH THE OHIO AND UNITED STATES CONSTITUTIONS.
ASSIGNMENT OF ERROR NO. 3:
 THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION BY IMPOSING CONSECUTIVE SENTENCES CONTRARY TO SECTION 2929.14, OHIO REVISED CODE, SUCH ACTION BEING CONTRARY TO LAW AND AN ABUSE OF DISCRETION.
ASSIGNMENT OF ERROR NO. 4:
 THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO GIVE A CHARGE ON VOLUNTARY MANSLAUGHTER.
ASSIGNMENT OF ERROR NO. 5:
 THE TRIAL COURT ERRED AND ABUSED ITS DISCRETION IN FAILING TO SUSTAIN DEFENDANT-APPELLANT'S BATSON OBJECTION.
ASSIGNMENT OF ERROR NO. 6:
 THE TRIAL COURT ERRED IN OVERRULING DEFENSE MOTION MADE PURSUANT TO RULE 29, OHIO RULES OF CIVIL PROCEDURE, AND THE FINAL VERDICT IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
ASSIGNMENT OF ERROR NO. 7:
 THE PROSECUTION ENGAGED IN PROSECUTORIAL MISCONDUCT IN CHARACTERIZING THE DEFENDANT-APPELLANT AS A MONSTER AND ARGUING THE ROCK WAS DROPPED ON THE VICTIM'S STOMACH, ALL BEING PLAIN ERROR.
In his first assignment of error, appellant contends that the juvenile court erred and abused its discretion in transferring him to the general division of the court of common pleas to be prosecuted as an adult. According to appellant, the juvenile court erred by binding him over solely on the basis of his crimes and without separately analyzing how he individually would react to rehabilitation efforts in the juvenile system. We disagree.
Pursuant to R.C. 2151.26(C), a juvenile court may bind a child over as an adult if there is probable cause to believe that the child committed an act that would constitute a felony if committed by an adult, the child is fourteen years of age or older and, after consideration of all relevant information and factors, there are reasonable grounds to believe that the child is not amenable to care or rehabilitation in the juvenile justice system and that the safety of the community may require that the child be placed under legal restraint for a period beyond the age of majority. Moreover, when determining whether to order the transfer of a case for criminal prosecution as an adult, the juvenile court must consider all of the following facts in favor of the transfer:
 (a) A victim of the act charged was five years of age or younger, regardless of whether the child who is alleged to have committed that act knew the age of that victim;
 (b) A victim of the act charged sustained physical harm to the victim's person during the commission of or otherwise as a result of the act charged.
 (c) The act charged is not a violation of section 2923.12 of the Revised Code, and the child is alleged to have had a firearm on or about the child's person or under the child's control while committing the act charged and to have displayed the firearm, brandished the firearm, indicated possession of the firearm, or used the firearm to facilitate the commission of the act charged.
 (d) The child has a history indicating a failure to be rehabilitated following one or more commitments pursuant to division (A)(3), (4), (5), (6), or (7) of section 2151.355 of the Revised Code.
 (e) A victim of the act charged was sixty-five years of age or older or permanently and totally disabled at the time of the commission of the act charged, regardless of whether the child who is alleged to have committed that act knew the age of that victim.
The purpose behind R.C. 2151.26(C) and its counterpart, Juv.R. 30, is "the assessment of the probability of rehabilitating the child within the juvenile justice system." State v. Douglas (1985), 20 Ohio St.3d 34,36. "In making this assessment, the juvenile court enjoys wide latitude to retain or relinquish jurisdiction, and the ultimate decision lies within its sound discretion." State v. Watson (1989), 47 Ohio St.3d 93,95. Thus, the relevant issue on appeal is not whether we would have reached the same result but whether the juvenile court abused its discretion, i.e., was without any reasonable basis, arbitrary, or unconscionable. State v. Hopfer (1996), 112 Ohio App.3d 521, 535.
It is also well-settled that, in deciding whether to relinquish jurisdiction over a child, a juvenile court may consider the seriousness of the alleged offense when determining if a child is not amenable to rehabilitation in the juvenile justice system. Watson, supra, at syllabus. In fact, R.C. 2151.26(C)(2) requires that the juvenile court consider five specific factors in favor of transferring the case; four of these factors specifically relate to the nature of the alleged offense.
Here, the juvenile court did not consider only the seriousness of appellant's alleged conduct in deciding whether to bind over appellant. As set forth in detail above, the juvenile court addressed a myriad of relevant factors, including appellant's background and psychological evaluation. Ultimately, however, the trial court found that the severity of the offenses alleged, the age of appellant (almost sixteen), and the applicability of two of the R.C. 2151.26(C)(2) factors tipped the balance in favor of finding that appellant was not amenable to rehabilitation and that the safety of the community may require that appellant be placed under legal restraint beyond his majority. Such a finding was authorized by the law and was certainly not without reason, arbitrary, or unconscionable. Cf. Hopfer, supra, at 356 (despite existence of many factors in child's background weighing in favor of the juvenile court retaining jurisdiction, juvenile court did not abuse its discretion in ordering transfer based primarily on the nature and severity of the alleged criminal act); see, also, State v. Walk (Nov. 14, 1995), Franklin App. No. 95APA03-268, unreported (noting that, even though some evidence presented during the bindover proceedings indicated that defendant could be rehabilitated in juvenile system, the trial court did not abuse its discretion in finding that such evidence was outweighed by the seriousness of the offense and the short time the juvenile system would have to rehabilitate defendant).
As a result, we find that the juvenile court did not abuse its discretion in relinquishing jurisdiction over appellant. Appellant's first assignment of error is not well-taken and is overruled.
In his second assignment of error, appellant contends that the trial court erred when, pursuant to the express language of Sup.R. 20, Section I(B), it denied trial counsel's motion for appointment of a second trial counsel to represent appellant in the criminal case below. Sup.R. 20 requires the appointment of at least two attorneys to represent indigent defendants facing a possible death sentence but specifically excludes from its provisions a juvenile defendant, such as appellant herein, who is indicted for a "capital offense" but because of his age cannot be sentenced to death. See R.C. 2929.03(D)(1) (providing that death may not be imposed as a penalty for aggravated murder if offender was under eighteen years of age at the time of the commission of the offense). According to appellant, strict application of Sup.R. 20 treats juveniles and adults charged with the same crimes (aggravated murder) differently and, as such, denies juveniles equal protection and due process under both the federal and state constitutions. Appellant notes that juveniles who are found guilty of aggravated murder with specification, while exempted from the death penalty, still face a possible sentence of life imprisonment without parole. Appellant further contends that, in denying his request for appointment of second counsel, he was essentially denied his right to effective assistance of trial counsel given that he faced a possible life sentence and two experienced prosecutors. We disagree.
First, there is no equal protection or due process violation in the application of Sup.R. 20 because it treats adults and juveniles the same based upon whether they face the possibility of a death sentence. Sup.R. 20 expressly provides that its provisions apply only where the death penalty can be imposed against the defendant. Sup.R. 20, Section I(B). Thus, even an adult charged with capital murder is not entitled to two defense attorneys under the rule where the prosecution does not seek the death penalty. Cf. State v. Griffin (1992), 73 Ohio App.3d 546, 553
(trial court not required to follow death penalty procedures where defendant charged with aggravated murder with specification waived right to jury trial in return for agreement of state not to request death penalty). Thus, since juvenile defendants do not face a sentence of death by operation of law, juvenile defendants, such as appellant herein, are treated the same as adults in equivalent circumstances.
Likewise, we reject appellant's contention that preparation and trial of this type of case is so burdensome, particularly when faced by two experienced prosecutors, that no single lawyer can do justice to his client. Appellant has cited no case standing for the proposition that effective assistance of counsel automatically requires appointment of multiple defense counsel based on the severity of punishment faced by the defendant or the number of prosecutors assigned to the case. More importantly, appellant was found not guilty of all aggravated murder charges. As such, appellant ultimately faced none of the sentencing options appellant contends warranted the appointment of a second counsel.
Finally, while appellant does not specifically assign ineffective assistance of trial counsel as a separate basis for reversing his conviction, appellant does argue that trial counsel was ineffective by failing to present mitigation evidence at the sentencing hearing. According to appellant, trial counsel's failures in this regard resulted in the imposition of consecutive sentences. Appellant, however, has not identified what evidence could have or should have been submitted in this regard. Moreover, any such evidence dehors the record could not be considered by this court in this appeal. As such, and based on this record, appellant has failed to establish ineffective assistance of counsel. See Strickland v. Washington (1984), 466 U.S. 668 (establishing the two-prong test for ineffective assistance of counsel, i.e., that trial counsel failed to meet an objective standard of reasonable representation which resulted in prejudice to defendant).
For the foregoing reasons, appellant's second assignment of error is not well-taken and is overruled.
In his third assignment of error, appellant contends that the trial court erred in imposing consecutive sentences. In particular, appellant contends that the record does not support the findings required under R.C. 2929.14(E) necessary to impose consecutive sentences and, as such, the imposition of consecutive sentences was contrary to law and an abuse of discretion. We agree, finding that the trial court failed to make the requisite findings required by law.
First, we address the state's contention that the decision of the trial court to impose consecutive sentences upon a defendant for multiple murder convictions is not subject to appellate review pursuant to R.C.2953.08(D). Pursuant to R.C. 2953.08(D), "[a] sentence imposed for aggravated murder or murder pursuant to sections 2929.02 to 2929.06 of the Revised Code is not subject to review under this section." (Emphasis added.)
R.C. 2953.08 generally governs appeals of sentencing determinations under the felony sentencing guidelines adopted under S.B. No. 2, effective July 1, 1996, and was enacted for purposes of creating a more structured and expanded appellate review of sentences. See, generally, Burt W. Griffin and Lewis R. Katz, Ohio Felony Sentencing Law (2000), West, Chapter 9, at T.9.16, pp. 653-655. By its terms, however, R.C.2953.08 is not the exclusive basis for appealing a sentence. See R.C.2953.08(A) (specifically stating that its provisions are "in addition to any other right to appeal"). Thus, an appeal of a murder sentence may still be based on traditional grounds for appeal independent of those set forth in R.C. 2953.08. Griffin and Katz, supra, at T.9.14, pp. 651-652. A contention that a sentence is "contrary to law" or "an abuse of discretion" has always been a basis for appeal under Ohio law, see, e.g., State v. Carroll (1995), 104 Ohio App.3d 372, and, as such, it is a traditional ground for appeal independent of those set forth in R.C.2953.08. Therefore, appellant's contention here that imposition of consecutive sentences is contrary to law (in particular, R.C.2929.14[E][4]) is not precluded by operation of R.C. 2953.08(D). But, see, State v. Brown (Feb. 9, 2001), Wood App. No. WD-00-033, unreported (consecutive sentences for two aggravated murder convictions were not subject to review pursuant to R.C. 2953.08[D]).
Under Ohio law, R.C. 2929.14(E)(4) governs imposition of consecutive sentences and permits the trial court to impose them only if the court makes certain findings. First, the trial court initially must find that "consecutive service is necessary to protect the public from future crime or to punish the offender." R.C. 2929.14(E)(4). Second, the trial court must find that "consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public." Id. Finally, the trial court must find any of the following:
 (a) The offender committed the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction imposed pursuant to section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under post-release control for a prior offense.
 (b) The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct.
 (c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender. [Id.]
Furthermore, when a trial court imposes consecutive sentences under R.C. 2929.14, it must state on the record the necessary findings for doing so and its reasons supporting such findings. R.C. 2929.19(B)(2)(c). The failure of the trial court to do so, requires remand for resentencing. See State v. Edmondson (1999), 86 Ohio St.3d 324, 328; see, e.g., State v. Maser (Apr. 20, 1999), Franklin App. No. 98AP-689, unreported.
At the sentencing hearing, the trial court made the following statement in support of its decision to impose consecutive sentences:
 That is, on the issue of whether these counts in this case should run consecutive or concurrently, the Court must look at 2929.14 (E) (4) of the Ohio Revised Code and determine whether or not this particular offense committed in this particular way, both these offenses committed in the particular manner, is the worst form of the offense. That is one of the indicators. The Court finds certainly under the facts of this case that they were the worst form of the offense.
 The Court would further find that although you, as your counsel has brought out various times during the trial, faced difficult circumstances in your life, those circumstances do not forgive the manner in which you handled this particular problem, and which the particularly violent and heinous manner in which these killings took place lead this Court to believe that public safety does need protected for whatever next time you may be faced with some sort of crisis in your life and the manner in which you would then handle it. This is a vicious killing, actually two killings, done in a vicious manner. The Court is very concerned with that, and in the interest of public safety believes that a consecutive sentence is necessary, and, indeed, if a consecutive sentence is not imposed, it would demean the seriousness of these offenses. And I agree with the State's position that, in fact, a concurrent sentence leaves one death unpunished, in essence, but that's but the Court makes these additional findings in accordance with the Revised Code requirements and will impose on each Counts One and Two, a 15 to life sentence to run consecutively with 195 days of jail-time credit. [Emphasis added.]
As the above excerpt indicates, the trial court expressly found only two of the three findings required under R.C. 2929.14(E)(4) for imposing consecutive sentences. First, the trial court specifically found that consecutive sentences were necessary to protect the public from future crime, and second, the trial court found that no single prison term would adequately reflect the seriousness of the offender's conduct. The trial court, however, did not specifically find that consecutive sentences were not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public.
While one could argue that a finding of proportionality could be inferred from the trial court's statements that appellant committed the worst form of murder and that consecutive sentences would leave one death unpunished, such inferences do not satisfy the statutory requirement that specific findings be expressly stated on the record. See Edmondson, supra, at 328 (trial court's statements that defendant's crime was particularly terrible and that recidivism was likely, did not constitute a finding that the minimum sentence would demean the seriousness of defendant's conduct or not adequately protect the public from future crime as required to impose more than minimum sentence pursuant to R.C.2929.14[B]).
As such, appellant's third assignment of error is well-taken to the extent that the trial court failed to make the requisite findings to support imposition of consecutive sentences. As such, the matter must be remanded for resentencing.
In his fourth assignment of error, appellant contends that the trial court erred in failing to instruct the jury on voluntary manslaughter as requested by appellant's trial counsel. Appellant contends that such an instruction was warranted because the evidence was sufficient to support a finding by the jury that appellant acted under the influence of sudden passion or fit of rage brought on by serious provocation by the victim. We disagree.
R.C. 2903.03, which defines the offense of voluntary manslaughter and distinguishes it from murder, states:
 No person, while under the influence of sudden passion or in a sudden fit of rage, either of which is brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force, shall knowingly cause the death of another or the unlawful termination of another's pregnancy.
Thus, a defendant is entitled to an instruction on the lesser offense of voluntary manslaughter if the evidence, when construed most favorably to the defendant, would allow the jury to reasonably find that the defendant established, by a preponderance of the evidence, that he acted under the influence of sudden passion or in a fit of rage brought on by serious provocation by the victim that is reasonably sufficient to incite the use of deadly force. State v. Rhodes (1992), 63 Ohio St.3d 613, 617-618. To warrant such an instruction, both an objective and subjective test must be met. State v. Shane (1992), 63 Ohio St.3d 630, 634-635. First, the provocation must be sufficient to arouse the passions of an ordinary person beyond the power of his or her control. Id. at 635. Second, if that objective test is met, defendant must show that, in this particular case, he was actually under the influence of sudden passion or in a sudden fit of rage. Id. at 634, see, generally, State v. Thomas (Mar. 26, 1996), Franklin App. No. 95APA08-984, unreported. In determining whether this subjective requirement has been satisfied, the emotional and mental state of defendant, as well as the conditions and circumstances that surrounded him, must be considered.
Here, appellant relies on the testimony of Detective Barr concerning appellant's confession to killing Barbara Watkins. In particular, appellant highlights portions of Detective Barr's testimony indicating that, on the day of the killing, appellant and Barbara Watkins argued about the pregnancy, that he wanted her to have an abortion, that she got angry about that, and that he then "lost it." Appellant also relies on testimony that several weeks earlier, he had given Barbara Watkins $200 for the purpose of getting an abortion, but that she had spent it on clothes and shoes. We find, however, that this evidence is insufficient to support a voluntary manslaughter charge.
As to the alleged argument between appellant and Barbara Watkins on the day in question, the evidence fails to indicate, in any reasonable detail, what Watkins may have said or done that might support a finding of serious provocation. At best, the evidence suggests that appellant and Barbara Watkins exchanged words. In most situations, however, words alone will not constitute reasonably sufficient provocation to incite the use of deadly force. Shane, supra, at paragraph one of the syllabus. Likewise, even assuming Barbara Watkins did use appellant's $200 for clothes instead of an abortion and that such conduct would constitute reasonably sufficient provocation (a matter we do not decide), too much time had elapsed between this conduct (including appellant's knowledge of it) and the killings to make it the basis for an instruction on voluntary manslaughter. See State v. Pierce (1980), 64 Ohio St.2d 281, 284
(insufficient provocation as a matter of law given time between telephone conversations inciting defendant to act and the killing on the next morning since no finder of fact could conclude that the killing was performed without time and opportunity for reflection or for passions to cool); State v. Collins (1994), 97 Ohio App.3d 438, 445 (victim's threats to defendant three days prior to the killing did not support voluntary manslaughter instruction).
Appellant's fourth assignment of error is not well-taken and is overruled.
In his fifth assignment of error, appellant contends that the trial court erred in allowing the prosecution to peremptorily excuse two black jurors. Appellant contends that the use of these challenges violated the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution as provided in Batson v. Kentucky (1986), 476 U.S. 79, and its progeny. We disagree.
In Batson, supra, the United States Supreme Court held that the Equal Protection Clause of the United States Constitution precludes purposeful discrimination by the state in the exercise of its peremptory challenges as to exclude members of minority groups from service on petit juries. Id. at 89; see, also, State v. Hernandez (1992), 63 Ohio St.3d 577, 581. Batson has since been extended to criminal defendants who are not of the same race as the excluded jurors, Powers v. Ohio (1991), 499 U.S. 400; civil cases, Edmonson v. Leesville Concrete Co., Inc. (1991), 500 U.S. 614; defense peremptory challenges, Georgia v. McCollum (1992), 505 U.S. 42; and gender based peremptory challenges, J.E.B. v. Alabama ex rel. T.B. (1994), 511 U.S. 127. The burden of proof is on the defendant to show that the state has used a peremptory challenge in a discriminatory manner. Batson, supra, at 98.
Following Batson, a three-step burden-shifting procedure has been established to determine if the peremptory challenge is race based. First, the defendant, as the opponent of the strike, must establish a prima facie showing that the state purposefully discriminated in exercising a peremptory challenge to remove a prospective juror. To make a prima facie case of purposeful discrimination, the defendant must demonstrate: (1) that members of a cognizable racial group were peremptorily challenged; and (2) that the facts and any other relevant circumstances raise an inference that the state used the peremptory challenges to exclude jurors on account of their race. State v. Hill (1995), 73 Ohio St.3d 433, 444-445.
If the defendant makes a prima facie case of discrimination, the burden then shifts to the state to provide a race-neutral explanation. Id. at 445. The neutral reason given by the state need not rise to the level justifying exercise of a challenge for cause. Batson, supra, at 97. In fact, the United States Supreme Court has held that "[t]he second step of this process does not demand an explanation that is persuasive, or even plausible. `* * * Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Purkett v. Elem. (1995), 514 U.S. 765, 768, quoting Hernandez v. New York (1991), 500 U.S. 352, 360 (plurality opinion).
Finally, the trial court must determine whether the neutral explanation offered by the state is credible, or is, instead, a "pretext" for unconstitutional discrimination. Hernandez, at 363. The United States Supreme Court noted in Hernandez, at 365: "In the typical peremptory challenge inquiry, the decisive question will be whether counsel's race-neutral explanation for a peremptory challenge should be believed. There will seldom be much evidence bearing on that issue, and the best evidence often will be the demeanor of the attorney who exercises the challenge." Because the findings of the trial court largely turn upon the trial court's evaluation of credibility, reviewing courts should give the determinations of the trial court great deference. Id. Therefore, a trial court's findings of no discriminatory intent will not be reversed on appeal absent a determination that it was clearly erroneous. Id. at 369; see, also, Hernandez, at 583, 589. Finally, "[t]he ultimate burden of persuasion regarding racial motivation rests with, and never shifts from, the opponent of the strike." State v. Gowdy (2000),88 Ohio St.3d 387, 393, citing Purkett, at 768.
Here, the prosecution used two peremptory challenges on two potential black jurors, a Mr. Smedley and a Mr. Green. Upon objection by appellant's trial counsel, the court requested that the prosecution provide a rationale for its challenges to these two jurors. As to Mr. Smedley, the prosecution made the following statement:
 MR. O'BRIEN: Yes, Your Honor. I think, quite clearly, as was evidenced by his first voir dire, Mr. Smedley at first said he could not fairly and impartially hear and decide the case because at his church he worked with youths. He expressed previously an acquaintance with a State's witness, the preacher, and my concern exercising a peremptory as well as eventually after further questioning about could he be fair and impartial, we're entitled to remove him because he hesitates, even on my further questioning on the second time around, he hesitates to say he has reservations and qualms about finding the Defendant guilty even though we may prove his guilt because of his age. And I think regardless of race, that that is a concern that I have. [Tr. 97-98.]
As to Mr. Green, the prosecution made the following statement:
 MR. O'BRIEN: And Mr. Green has many of the same reasons as well. He made a comment that he didn't think a 16-year-old should be sent to an adult prison facility. He's employed at DYS. He fully knows a finding of guilty on an aggravated murder charge will cause the Defendant to be sentenced to a state prison facility.
* * *
 MR. O'BRIEN: And he had a relative who as a 16-year-old was tried as an adult and sent to an adult facility, and his comment was that you might as well have thrown him away, or something like that. Again, while it made [sic] not be cause, certainly I don't want, regardless of race, that kind of juror on the case when I've got a 16-year-old looking at life without parole. [Tr. 98-99.]
Based upon these explanations, the trial court overruled appellant's Batson objection. In so doing, the trial court found that, while neither of the prosecution's concerns about Mr. Smedley or Mr. Green would support a challenge for cause, it was within the prerogative of the state to exercise a peremptory on the basis that they did.
On appeal, appellant contends that the reasons given by the prosecution were "weak" and points out that both Mr. Smedley and Mr. Green ultimately stated that they could be fair and impartial and could follow the law as given by the trial court. The prosecution's explanations for their challenges, however, are racially neutral on their faces, and are otherwise supported by the transcript.
Mr. Green stated that he worked for the Department of Youth Services, expressed concern about juveniles being treated as adults in the criminal justice system, and revealed that he had a sixteen-year-old cousin who spent thirteen years in jail. Likewise, Mr. Smedley stated that he would be very uncomfortable and hesitant to find someone guilty, in part, because of his work with youths at his church. Thus, Mr. Green's and Mr. Smedley's statements, taken as a whole, suggests a possible reluctance to find appellant guilty of the crimes charged because of personal experiences. As such, the trial court's decision to overrule appellant's Batson challenge was not erroneous. Appellant's fifth assignment of error is not well-taken and is overruled.
In his sixth assignment of error, appellant contends that his convictions are not supported by sufficient evidence and are otherwise against the manifest weight of the evidence. Again, we disagree.
Sufficiency of the evidence is the legal standard applied to determine whether the case should have gone to the jury. State v. Thompkins (1997), 78 Ohio St.3d 380, 386. In other words, sufficiency tests the adequacy of the evidence and asks whether the evidence introduced at trial is legally sufficient as a matter of law to support a verdict. Id. "[T]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus, following Jackson v. Virginia (1979), 443 U.S. 307. The verdict will not be disturbed unless the appellate court finds that reasonable minds could not reach the conclusion reached by the trier of fact. Jenks, supra, at 273. If the court determines that the evidence is insufficient as a matter of law, a judgment of acquittal must be entered for the defendant. See Thompkins, supra, at 387.
Even though supported by sufficient evidence, a conviction may still be reversed as being against the manifest weight of the evidence. Thompkins, supra, at 387. In so doing, the court of appeals sits as a "thirteenth juror" and after "`reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" Id. (quoting State v. Martin [1983], 20 Ohio App.3d 172, 175); see, also, Columbus v. Henry (1995), 105 Ohio App.3d 545, 547-548. Reversing a conviction as being against the manifest weight of the evidence should be reserved for only the most "`exceptional case in which the evidence weighs heavily against the conviction.'" Thompkins, supra, at 387.
Murder is defined as purposely causing the death of another or the unlawful termination of another's pregnancy. R.C. 2903.01. Appellant confessed to Detective Barr, his cousin, and Pastor Butler that he cut Barbara Watkins with a bottle, strangled her, and dropped a large rock on her head. Testimony was also admitted that appellant had previously threatened to kill Barbara Watkins and her unborn child. Given this evidence, appellant's convictions for murder are supported by sufficient evidence and not against the manifest weight of the evidence. Appellant's sixth assignment of error is not well-taken and is overruled.
In his seventh assignment of error, appellant contends that the prosecution engaged in prosecutorial misconduct during closing arguments. In particular, appellant contends that the prosecution improperly called appellant a "monster" and improperly argued that appellant dropped a fifty pound rock on the victim's abdomen with the intention of killing the unborn baby. Specifically, appellant challenges the following statement by the prosecution during rebuttal closing argument:
 And I agree with one thing that Mr. Shwartz said in terms of what he did, even though 15, was the act of a monster, and I think the evidence supports that. Anyone sticking and slashing with a broken beer bottle, anyone using this rock as a weapon, which I submit Dr. Dean's testimony will support that it was dropped on that baby, she said the bones of the baby were disarticulated, which is a fancy way of saying they were spread around. Look at the photos yourself, that you'll have in the jury room. That rock was dropped on her stomach with the intention again of killing the baby. [Tr. 383.]
The test used to determine the existence of prosecutorial misconduct is whether the challenged conduct or comments of counsel are improper and, if so, whether they prejudicially affect substantial rights of the defendant. State v. Smith (2000), 87 Ohio St.3d 424, 442. "[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor." Smith v. Phillips (1982), 455 U.S. 209, 219.
As such, misconduct is not grounds for reversal unless it is shown that the defendant has been denied a fair trial. State v. Maurer (1984),15 Ohio St.3d 239, 266. Trial counsel is permitted considerable latitude in presenting opening and closing arguments, and the question of whether counsel has exceeded appropriate bounds is left to the sound discretion of the trial court. Id. at 269.
Moreover, in this case, appellant's trial counsel did not object to either of the two allegedly improper statements made by the prosecution and, as such, has waived all but plain error. To constitute plain error, the error must be obvious on the record, palpable, and fundamental such that it should have been apparent to the trial court without objection. See State v. Tichon (1995), 102 Ohio App.3d 758, 767. Moreover, plain error does not exist unless appellant establishes that the outcome of the trial clearly would have been different but for the trial court's allegedly improper actions. State v. Waddell (1996), 75 Ohio St.3d 163,166. Notice of plain error is to be taken with utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice. State v. Phillips (1995), 74 Ohio St.3d 72, 83; State v. Ospina (1992), 81 Ohio App.3d 644, 647. Based upon the above referenced standards of review, we find no prosecutorial misconduct in this case.
First, the prosecution did not call appellant a monster but, rather, referred to appellant's conduct as that of a monster. Moreover, the prosecution's reference to appellant's conduct was proper rebuttal argument. During his closing argument, appellant's trial counsel first introduced the use of the word "monster" by characterizing the state's position as wanting the jury "to believe that on August 26 of last year he [appellant] became a 15-year-old monster all of a sudden." (Tr. 372.) The prosecution's later use of the word monster in describing the conduct alleged against appellant was not improper as it was invited by appellant's counsel. See State v. Brown (1988), 38 Ohio St.3d 305,316-317 (holding that rebuttal statements by prosecution that defendant was a monster were not improper given that defense counsel first invited such statements referring to a co-defendant as a "slick talking monster").
Likewise, the prosecution's argument concerning appellant dropping a large rock on Barbara Watkins' abdomen was reasonably supported by the evidence adduced at the trial. Despite appellant's statements to his cousin, Pastor Butler, and Detective Barr that he dropped the rock on Barbara Watkins' head, the deputy coroner testified that Barbara Watkins' skull did not exhibit any fractures consistent with such a trauma. The deputy coroner further testified that the condition of the victim's body was consistent with a rock being dropped on her abdomen. In particular, she testified that the decomposition pattern on her body suggested trauma to her abdomen. Given that both the prosecution and the defense have wide latitude in summation as to what the evidence has shown and what reasonable inferences may be drawn from the evidence, State v. Lott (1990), 51 Ohio St.3d 160, 165, we cannot find that the prosecution's statements in this case constitute prosecutorial misconduct.
Finally, we do not see how the prosecution's argument as to exactly where appellant dropped the rock (i.e., on Barbara Watkins' head or her abdomen) was materially prejudicial to defendant. A description of either act is likely to elicit a similar reaction from the jury, and either act supports a finding of murder of both victims. Appellant's seventh assignment of error is not well-taken and is overruled.
For the foregoing reasons, appellant's first, second, fourth, fifth, sixth, and seventh assignments of error are overruled. Appellant's third assignment of error is sustained to the extent that this court finds that the trial court failed to make the proper findings necessary to support imposition of consecutive sentences. We, therefore, affirm appellant's conviction for two counts of murder but remand the matter for resentencing.
 _________________________ LAZARUS, J.
DESHLER, J., concurs. BRYANT, P.J., concurs separately.
[1] The record indicates that appellant's mother was murdered when appellant was two and one-half years old and that appellant has lived with his aunt and uncle, Joyce and Theodore Tucker, most of his life.