The STATE of Ohio, Appellee,

v.

TICHON, Appellant.■

[Cite as *State v. Tichon* (1995), 102 Ohio App.3d 758.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 16653.

Decided April 19, 1995.

*Thomas M. DiCaudo,* Assistant City Prosecutor, for appellee.

*J. Dean Carro,* for appellant.

DICKINSON, Judge.

Defendant Ronald Tichon has appealed from his conviction on two counts of menacing by stalking and one count of aggravated menacing. He argues that (1) there was insufficient evidence presented to the trial court that he caused his victims to suffer mental distress; (2) his constitutional rights were violated by the state's failure to separate its witnesses; (3) the state failed to comply with the trial court's discovery orders, thereby prejudicing his ability to properly prepare his defense; (4) the trial court committed plain error by permitting a police officer to testify regarding defendant's exercise of his *Miranda* rights; and (5) the trial court incorrectly received impermissible other acts testimony. This court affirms the judgment of the trial court because (1) there was sufficient evidence presented to the trial court establishing that the victims suffered mental distress; (2) the trial court did not abuse its discretion in failing to take measures to remedy the violation of its separation order; (3) the trial court did not incorrectly permit one of the complaining witnesses to testify; (4) the police officer's testimony concerning defendant's refusal to make a statement to police did not rise to the level of plain error; and (5) the trial court properly received other acts evidence.

## I

Defendant was indicted on two misdemeanor counts of menacing by stalking and one count of aggravated menacing. He was tried before a jury in the Akron Municipal Court commencing January 20, 1994. After a two-day trial, defendant was found guilty of all three offenses and sentenced to serve two consecutive one-hundred-eighty-two-day terms of incarceration.

The purported victims of defendant's criminal conduct were his neighbors, Theresa and Christopher Thorn. The Thorns resided at 542 Fouse Street, next

door to defendant's residence that was located at 536 Fouse Street. Mrs. Thorn testified that defendant and his family had moved next to the Thorns' home during October or November 1992 and that the two families had been "neighborly" with each other until May 1993. Since May 1993, the relationship between the two families had degenerated to the point that Mrs. Thorn and her husband "just want[ed] to be left alone."

The indictment contained allegations that defendant committed menacing by stalking "on or about October 1993" and "on or about November 1, 1993." Additionally, according to the indictment, defendant committed aggravated menacing "on or about the 28th day of October 1993." Evidence was presented at trial of an altercation between defendant and Mr. Thorn that occurred on October 25, 1993. Mr. Thorn testified that, on that date, he, his wife, and their nephew were in front of their home clearing leaves when defendant pulled his car into his driveway. According to Mr. Thorn, when defendant pulled into his driveway, he "jumped out of his car" and began "hollering and screaming." Mr. Thorn testified that defendant used a number of profanities and accused him of being "the reason I got transferred." Mr. Thorn stated that defendant spat on him.

Testimony was also presented indicating that a second incident between defendant and the Thorns occurred on October 28, 1993. Apparently, Mrs. Thorn drove her husband to work every morning and typically did so at approximately 6:40 a.m. On the morning of October 28, 1993, defendant allegedly followed the Thorns. Mr. Thorn testified as follows, indicating that, after they left their home, defendant followed their car at a close distance:

"Q: When did you notice [defendant] behind you?

"A: When we backed out of the drive—as we were backing out, he was coming around the corner; then we started to pull down, and he came directly behind us.

"Q: You said he didn't have any headlights on?

"A: No, nothing. No parking lights—

" * * *

"Q: What happened?

"A: I told my wife to give it some gas. It was obvious to me he was following us.

" * * *

"Q: What, if anything, happened?

"A: When we stopped at the stop sign, he was directly behind us. I turned around and looked at him. And he still hadn't turned on his headlights. He turned right with us. I told her, I says, 'Let's go. Let's try to lose him.'

"We turned right again and went up a couple more blocks. Then we cut through a parking [lot] at Lawson's store, Dairy Mart, whatever you call it. About 35 mile an hour, through a parking lot with a station wagon. He was right on our tail.

"Q: When you say 'right on your tail,' what do you mean by that? How close?

"A: [Two] or [three] feet. Right around there. * * * Then we went up and turned right again and was zigzagging through the side streets. You know, we were trying to lose him. He was right on our butts. * * *

"By this time, we was reaching speeds of 50 miles an hour in a station wagon on side streets. You can say I was a little scared about this, yeah."

Ultimately, the Thorns were able to lose defendant in traffic.

Additionally, evidence was presented that, on November 1, 1993, defendant and his wife took a photograph of Mr. and Mrs. Thorn as Mrs. Thorn was picking her husband up from work. Mr. Thorn testified that, just as he and his wife were leaving, he saw a flash and shouted, "It's a gun." Further, Mr. Thorn testified that, after the photograph was taken, defendant followed them back towards their home. According to Mr. Thorn, defendant followed their car very closely while travelling at a high rate of speed.

As a result of these incidents, defendant was indicted on two counts of menacing by stalking and one count of aggravated menacing. After a jury trial, defendant was found guilty of all three charges. Defendant has timely appealed to this court.

## II

### A

Defendant's first assignment of error is that the state failed to present sufficient evidence to the jury that he caused his alleged victims to suffer mental distress. Primarily, defendant, arguing that the prosecution was required to present expert testimony, states:

"In the instant case, the city did not offer expert testimony of any kind. Instead, the city relied on the testimony of lay witnesses to prove the required element. There was no evidence that any of these witnesses had any type of medical training necessary to diagnose or recognize a temporary substantial incapacity or mental illness that would normally require psychiatric treatment."

R.C. 2903.211(A) states that "[n]o person by engaging in a pattern of conduct shall knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person." R.C. 2903.211(C)(2) defines "mental distress" as "any mental illness or condition * * * that would normally require psychiatric treatment." This court has determined that expert testimony is not required to establish the existence of mental distress for the purpose of proving an element of menacing by stalking. *State v. Bilder* (1994), 99 Ohio App.3d 653, 651 N.E.2d 502. In *Bilder*, this court quoted the Ohio Supreme Court, which had held in an analogous case, that expert testimony was not required to establish an emotional injury:

" '[Expert] medical testimony can assist the judicial process in determining whether the emotional injury is indeed, serious * * *. However, lay witnesses who were acquainted with the plaintiff, may testify as to any marked changes in the emotional or habitual makeup that they discern in the plaintiff after the accident has occurred. The jurors themselves, can refer to their own experiences in order to determine whether, and to what extent, the defendant's conduct caused the serious emotional distress.' " *Id.* at 665, 651 N.E.2d at 510, quoting *Paugh v. Hanks* (1983), 6 Ohio St.3d 72, 80, 6 OBR 114, 121, 451 N.E.2d 759, 767.

Similarly, in this case, the jurors could have relied on their experiences and on the testimony presented by Mr. and Mrs. Thorn to determine if, in fact, the Thorns suffered mental distress because of defendant's actions.

There was sufficient evidence presented to the trial court for the jury to find beyond a reasonable doubt that Mr. and Mrs. Thorn suffered mental distress. Mrs. Thorn testified that, as a result of defendant's conduct, she started going to counseling at "[t]he end of October, first of November," stating:

"I go to counseling once a week. And I feel like I'm losing control. I'm normally a strong woman. I normally hold myself together. All I do is cry. I have to watch where I go; who's behind me; what stores to go in. I live in terror. It used to be I could go home and find peace. But I can't any more. I'm afraid to go home."

Additionally, Mr. Thorn testified that he suffered mental distress as a result of defendant's activities, stating:

"I'm on sleeping pills, tranquilizers. It affected my work. I've been watching my wife cry for about seven months. I'm at my wit's end. I don't know what to do anymore. I've done everything that I can."

Inasmuch as there was sufficient evidence before the jury that both Mr. and Mrs. Thorn both suffered mental distress, defendant's first assignment of error is overruled.

B

Defendant's second assignment of error is that the trial court incorrectly failed to enforce its order that the witnesses be separated. Defendant argues that the trial court ordered the state's witnesses to be separated pursuant to Evid.R. 615 and that the state failed to comply with that order. He asserts that several of the state's witnesses were placed in the same room while they were waiting to testify and that some of them acknowledged talking to each other about the case.

As a result of this activity, defendant, at the end of the state's case in chief, moved to have all the witnesses' testimony stricken or, in the alternative, for a mistrial. The trial court overruled defendant's motion to strike the witnesses' testimony and his motion for a mistrial,[1] stating:

"Court at this time is going to overrule the motion for mistrial and/or striking of the evidence. The court does not believe that this was done with any connivance on the state for purposes of trying to taint any testimony. The court does not know, nor does it believe, that based upon my understanding of what the parties testified to, that there was such testimony that involved the hint or taint or coaching of someone else that would have led to a different conclusion."

The trial court explained that the reason for its ruling was because "a better place to have brought this objection would have been at the time that each of these witnesses was beginning to testify." The trial court further stated that the "issue should have been brought to the attention of the court as soon as the Defendant felt that the testimony was tainted."

"The purpose of a separation order is 'so that [witnesses] cannot hear the testimony of other witnesses,' * * * and tailor their own testimony accordingly." *State v. Waddy* (1992), 63 Ohio St.3d 424, 434, 588 N.E.2d 819, 828, quoting Evid.R. 615. "Thus, a spectator or witness may not tell a prospective witness what has taken place in court if the judge has ordered separation of witnesses." *Id.* at 434, 588 N.E.2d at 828, citing *State v. Spirko* (1991), 59 Ohio St.3d 1, 14, 570 N.E.2d 229, 246. A trial court's determination to allow a witness to testify despite a violation of its separation order will not be reversed on appeal, absent an abuse of discretion. *State v. Morris* (1982), 8 Ohio App.3d 12, 17, 8 OBR 13, 18, 455 N.E.2d 1352, 1357.

The gravamen of defendant's argument is that the trial court incorrectly failed to take any curative measures to remedy the state's failure to follow the

---

1. Defendant does not specifically argue that the trial court incorrectly failed to grant his motion for a mistrial or his motion to strike the witnesses' testimony. Rather, defendant argues that his constitutional rights to confront his accusers and to due process of law were violated and that the trial court refused to remedy those violations by failing to take any curative measures.

trial court's order to separate its witnesses. In this case, however, the trial court did not abuse its discretion by permitting the witnesses to testify without the benefit of any remedial measure. As previously noted, the trial court concluded that the violation of its separation order was not done with the purpose of tainting any testimony. Additionally, the trial court noted that there was no indication that the witnesses' testimony was actually tainted or would have been different had the separation order not been violated. Inasmuch as there was no indication that the conversations that various witnesses had involving the case actually affected their testimony, and inasmuch as defendant did not bring the state's violation of the separation order to the trial court's attention when the witnesses testified, the trial court did not abuse its discretion by refusing to remedy the state's violation of its order. Defendant's second assignment of error is overruled.

## C

Defendant's third assignment of error is that the trial court incorrectly failed to enforce its discovery orders. Defendant argues that the state failed to provide necessary discovery material until the day before defendant's trial. Additionally, he claims that other discovery material was not provided until trial had already commenced. He asserts that he was prejudiced in the preparation of his defense by the state's failure to timely provide the discovery material.

Specifically, defendant complains that Mr. Thorn had a criminal record that was not disclosed by the state in a manner that permitted defendant to effectively cross-examine him. Defendant argued to the trial court that the state provided incomplete information concerning Mr. Thorn's prior criminal convictions. As a result, defendant requested that the trial court prohibit Mr. Thorn from testifying, but required the prosecutor to certify that the criminal record provided by the state was accurate, stating:

"The Court: * * * The issue is whether or not we have followed the appropriate requirements by way of discovery. Again, I remind you of my comment yesterday. I don't say that as a criticism of everybody; but that method and manner that the City Prosecutor's Office [uses] is quite good until someone decides that they want to push a button for something more technical, which is something they're entitled to.

"It's clear [defendant's counsel] filed her request for discovery * * * indicating that she had not received that information. That was done in a timely manner. It was at the hearing yesterday that we indicated we would attempt to get the information.

"[Defendant's counsel's] concern is that the information that we have is not sufficient for her purposes to determine convictions as to time, date, circumstances, that she might be able to bring out by way of cross examination. On the other hand, she does have information that would indicate that the potential witness does have a serious offense, penitentiary offense if you will; and a series of misdemeanor convictions.

"What I'm going to ask you is, are you certifying to me that what you have provided is his record, to the best of your knowledge?

"[Prosecutor]: To the best of my knowledge, yes, it is.

"The Court: The Court believes that on convictions that are set forth in those records, Court believing that had there been a response, heretofore, given the time and so forth of this trial, that the defendant, in this Court's opinion is not [prejudiced]. Thereby, inasmuch as you would have the potential to ask about one felony conviction, and as many as a dozen misdemeanor convictions—and if that doesn't potentially give the jury an opportunity to evaluate the credibility of a witness, I don't know what else does. I don't know whether or not it's going to come out on direct examination or what. On the other hand, the Court will, at this time, permit the witness to testify over your objection."

■■■ A trial court has broad discretion to impose discovery sanctions when " 'it is brought to the attention of the court that a party has failed to comply with [the criminal discovery] rule or with an order issued pursuant to [that] rule * * *.' " *Lakewood v. Papadelis* (1987), 32 Ohio St.3d 1, 3, 511 N.E.2d 1138, 1140, quoting Crim.R. 16(E)(3). Although there appears to have been confusion over the information provided by the state concerning Mr. Thorn's prior criminal convictions, the trial court required that the prosecutor certify that the information provided to the defendant was accurate to the best of the prosecutor's knowledge. Additionally, the trial court concluded that defendant was not prejudiced by the state's failure to provide more complete information concerning Mr. Thorn's criminal record. Accordingly, this court cannot conclude that the trial court abused its discretion by permitting Mr. Thorn to testify. Defendant's third assignment of error is overruled.

## D

Defendant's fourth assignment of error is that the trial court incorrectly permitted the state to elicit testimony from a police officer regarding defendant's refusal to make a statement to police. Defendant acknowledged that he did not object to the admission of the testimony at trial, and thus has argued that the admission of that testimony was plain error.

In the absence of plain error within the meaning of Crim.R. 52(B), "[a]n appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have been avoided or corrected by the trial court." (Citation omitted.) *State v. Williams* (1977), 51 Ohio St.2d 112, 5 O.O.3d 98, 364 N.E.2d 1364, paragraph one of the syllabus, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3137, 57 L.Ed.2d 1156. In order to constitute plain error, an error must be obvious and have a substantial adverse impact on the integrity of and the public's confidence in judicial proceedings. "The error must be obvious on the records, palpable, and fundamental, and in addition it must occur in exceptional circumstances where the appellate court acts in the public interest because the error affects 'the fairness, integrity or public reputation of judicial proceedings.'" (Footnotes omitted.) *State v. Craft* (1977), 52 Ohio App.2d 1, 7, 6 O.O.3d 1, 4, 367 N.E.2d 1221, 1225–1226, quoting *United States v. Atkinson* (1936), 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555, 557.

In this case, defendant was questioned by the police after he was arrested on October 28, 1993. The police officer, who questioned defendant, testified that defendant refused to make a statement:

"Q: Where did you talk to him?

"A: We went out to the car wash on West Avenue in Tallmadge, Ohio where he was working. Brought him to the station on the sixth floor. Read him his rights and proceeded to ask him what happened.

"Q: Was there anyone else in the room with you as you were asking the questions?

"A: Yes. Officer Bralick was with me.

"Q: Please describe to the Court that conversation. .

"A: Yes. Mr. Tichon refused to say anything to us."

Additionally, defendant was questioned by the police after the November 1, 1993, incident. A second police officer testified that, on that occasion, defendant gave an extensive statement recounting his whereabouts that day. This court cannot conclude that the admission of a single statement made by defendant during one interview when he refused to give a statement to police affected the fairness, integrity or public reputation of judicial proceedings or constituted a manifest miscarriage of justice. Accordingly, since the trial court's admission of the police officer's statement did not rise to the level of plain error, defendant's fourth assignment of error is overruled.

### E

Defendant's fifth assignment of error is that the trial court incorrectly received impermissible other acts testimony. Defendant argues that the trial court permitted the state to elicit testimony on several occasions concerning incidents that occurred between defendant and the Thorns that were not the subject of the indictment. These events concerned the frequency with which defendant allegedly took photographs of the Thorns and the number of times that the police were called to settle a dispute between the neighbors.

R.C. 2903.211(A) provides:

"No person by engaging in a pattern of conduct shall knowingly cause another to believe that the offender will cause physical harm to the other person or cause mental distress to the other person."

R.C. 2903.211(C)(1) defines "pattern of conduct" as:

"[T]wo or more actions or incidents closely related in time, whether or not there has been a prior conviction based on any of those actions or incidents."

Evid.R. 404(B) provides for admission of other acts evidence for a number of purposes, including showing motive or intent, while excluding such evidence when it is offered for the purpose of proving a person's character "in order to show that he acted in conformity therewith." In *State v. Bilder, supra*, 99 Ohio App.3d 653, 658, 651 N.E.2d 502, 505, this court noted that "[o]ther acts evidence can be particularly useful in prosecutions for menacing by stalking because it can assist the jury in understanding that a defendant's otherwise innocent appearing acts, when put into the context of previous contacts he has had with the victim, may be knowing attempts to cause mental distress." Similarly, in *State v. Woodgeard* (Apr. 29, 1994), Fairfield App. No. 45–CA–SEP–1993, unreported, 1994 WL 167928, the Fifth District Court of Appeals held that a trial court did not err by receiving evidence that the defendant had previously assaulted the victim, had followed her, and had placed numerous harassing telephone calls to her. In *Woodgeard*, the court determined that the other acts evidence supplied the context from which it became clear that what otherwise appeared to be an innocent act, driving in the victim's neighborhood, was actually, knowingly causing the victim mental distress.

Accordingly, in this case, the trial court did not incorrectly receive other acts evidence. The testimony, concerning the numerous photographs that defendant allegedly took of the Thorns, the number of instances that police were called to the Thorns' home, and the fact that the Thorns had previously instituted a civil lawsuit for harassment, taken in context with defendant's actions of closely following the Thorns to and from work at a high rate of speed, assisted the jury in determining that defendant knowingly engaged in a pattern of conduct aimed

at causing his victims mental distress.  Defendant's fifth assignment of error is overruled.

## III

Defendant's assignments of error are overruled.  The judgment of the trial court is affirmed.

*Judgment affirmed.*

REECE, P.J., and QUILLIN, J., concur.